IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

UNITED STATES OF AMERICA, )
)
Plaintiff, )
)
v. ) Case No. 11-00005-02-CR-W-GAF
)
JAVON TURNER, )
)
Defendant. )

REPORT AND RECOMMENDATION

This matter is currently before the Court on defendant Turner's Motion to Suppress Evidence
Recovered From 2632 Euclid, Kansas City, Missouri (doc #59). For the reasons set forth below, it
is recommended that this motion be denied.

I.  INTRODUCTION

On December 20, 2010, a criminal complaint was filed charging defendants Jeremiah
Kraushaar, Javon Turner and Finis Richardson with conspiracy to commit armed robbery and being
convicted felons in possession of firearms.

On January 4, 2011, the Grand Jury returned a two-count indictment against defendants
Kraushaar, Turner and Richardson. Count One of the indictment charged defendants Kraushaar,
Turner and Richardson with being convicted felons in possession of firearms. Count Two charged
defendant Turner with being a convicted felon in possession of a firearm.

On April 5, 2011, the Grand Jury returned a thirteen-count superseding indictment against
defendants Kraushaar, Turner and Richardson.[1]

On September 20, 2011, the Grand Jury returned a thirteen-count second superseding
indictment against defendants Kraushaar and Turner.[2] Defendant Turner is charged in all thirteen
counts. The second superseding indictment charges defendant Turner with conspiracy to commit

---

[1]Defendant Richardson entered a guilty plea on June 13, 2011.

[2]Defendant Kraushaar entered a guilty plea on October 17, 2011.

armed robbery, committing armed robbery of several businesses, brandishing firearms during the commission of crimes of violence, and being a convicted felon in possession of firearms.

On January 4, 2012, an evidentiary hearing was held on defendant's motion to suppress. Defendant Turner was represented by appointed counsel David H. Johnson. The Government was represented by Assistant United States Attorney D. Michael Green. The Government called Officer John A. Keil, Officer Brian Tomanio and Detective Cristen Stammler of the Kansas City, Missouri Police Department as witnesses. The defense called Kaneshia Handley, defendant's girlfriend, to testify.

## II. FINDINGS OF FACT

On the basis of the evidence adduced at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. Early in the morning on December 19, 2010, officers were conducting surveillance on the Apple Market at 1215 Emmanuel Cleaver Boulevard. (Tr. at 4) This surveillance was part of an investigation into a string of armed robberies of area grocery stores. (Tr. at 5-6) A chase ensued and three individuals were taken into custody, one of whom was Javon Turner. (Tr. at 5)

2. Following the arrest of the three individuals, Sergeant Greenwell, who is with the Career Criminal Section, directed Officer John Keil to go to 2632 Euclid, Kansas City, Missouri, and conduct a knock and talk. (Tr. at 6-7) Sergeant Greenwell wanted officers to go to 2632 Euclid to see if they would be allowed to go inside and sweep the house for any other suspects that might possibly be there. (Tr. at 6) Sergeant Greenwell also wanted the officers to try and get a consent to search to see if there was evidence in the house of previous crimes. (Tr. at 24) Officer Keil testified that he had been given no information as to who resided at the residence or who might be present at the residence. (Tr. at 16) Officer Keil did not know that 2632 Euclid was the residence of Javon Turner. (Tr. at 24)

3. Officer Brian Tomanio testified that following the arrest of the three individuals, he was told to walk down the block looking for evidence that was possibly thrown from the vehicle. (Tr. at 41) Officer Tomanio was then told to respond to 2632 Euclid to assist with a consent to search. (Tr. at 41) Officer Tomanio was told that 2632 Euclid was Javon Turner's address. (Tr. at 41)

4. Detective Cristen Stammler testified that on the morning of December 19, 2010, he was asked to assist in the investigation of a group of grocery store robberies. (Tr. at 51) Detective Stammler was directed to respond to 2632 Euclid to determine whether or not the officers were going to get a voluntary consent to search signed or whether they were going to need to apply for a search warrant for the residence as it was connected to the robbery investigation. (Tr. at 51-52, 57)

2

5.    Four officers, Office Keil, his partner, Officer Hendershot, Officer Crump and Officer Sola arrived at 2632 Euclid shortly after 7:00 a.m.  (Tr. at 7)  Officer Hendershot knocked on the door.  (Tr. at 7)  Officer Keil saw a female look out of a third floor window.  (Tr. at 7)  The female came down the stairs and opened the door.  (Tr. at 7)  The officers explained to her who they were, that they were there regarding an ongoing robbery investigation and asked if they could come in and speak with her.  (Tr. at 7-8)  Kaneshia Handley testified that basically, the officers just invited themselves in.  (Tr. at 67)  Ms. Handley did not tell the officers to leave her house.  (Tr. at 77)  Once inside, the officers asked if they could do a quick protective sweep of the house to make sure there were no other adults there.  (Tr. at 8)  Officer Keil testified that the female gave the officers permission to conduct a protective sweep of the house.  (Tr. at 8)  Ms. Handley testified that she does not recall being asked for permission for a protective sweep.  (Tr. at 77)  No other adults were found in the house.  (Tr. at 8)  Children were asleep upstairs.  (Tr. at 8)  No items of evidence were seized during the protective sweep.  (Tr. at 22)  Officer Tomanio arrived at 2632 Euclid just as the officers were finishing the protective sweep.  (Tr. at 34)

6.    The officers asked the female for her name and she told them her name was Kaneshia Handley.  (Tr. at 9)  Ms. Handley told the officers that she lived there in the house at 2632 Euclid with her boyfriend, Javon Turner.  (Tr. at 9, 54)  Ms. Handley told Detective Stammler that she had lived there since October of 2010.  (Tr. at 54)  Detective Stammler testified that he noticed photographs of Ms. Handley with Mr. Turner around the house.  (Tr. at 54)  Ms. Handley confirmed that there were photographs of her and Javon Turner throughout the house.  (Tr. at 75)  Ms. Handley testified that she considered herself to live at 2632 Euclid.  (Tr. at 75)  Ms. Handley had her own key to the house and could come and go as she wished.  (Tr. at 72)

7.    Officer Keil asked Kaneshia Handley if she would consent to a search of the house.  (Tr. at 10-11, 28-29)  Officer Keil testified that at first, Ms. Handley was a little reluctant, saying "I don't know, I don't know."  (Tr. at 11, 25)  Officer Keil testified that Ms. Handley smoked a cigarette,[3] went upstairs to get one of her children and then two or three minutes after they had originally asked for consent, told the officers that she would sign the consent form.  (Tr. at 11)  Officer Tomanio testified that Ms. Handley just took a while to think about it and then she signed the consent form.  (Tr. at 44)

8.    When Detective Stammler arrived at 2632 Euclid, Kaneshia Handley was talking with Officers Keil and Tomanio.  (Tr. at 60-61)  Detective Stammler testified that Ms. Handley told him that she was not sure whether or not she wanted to sign the consent form.  (Tr. at 53-54)  Detective Stammler told Ms. Handley that she did not have to sign the form and that she could require the officers to apply for a search warrant and ask a judge to give them permission to search the house.  (Tr. at 54)  Detective Stammler testified that Ms. Handley was getting stuff ready for her kids to go with her sister and then came back and said that she decided she wanted to sign the form.  (Tr. at 61)  Because of her hesitation and their prior conversation, Detective Stammler testified that he reminded Ms. Handley that she did not have to sign the form and that she could make the officers go apply for a search warrant.  (Tr. at 61)  Ms. Handley told Detective Stammler that she wanted to go ahead and sign

---

[3]Ms. Handley denied that she was allowed to smoke a cigarette.  (Tr. at 72)

it.  (Tr. at 61)  Ms. Handley testified that she was told that she did not have to sign the consent form, but that she was not told she could make the officers go apply for a search warrant.  (Tr. at 72-73)

9.       Kaneshia Handley testified that when she was first asked for her consent to search the house, she said that it was not just her house.  (Tr. at 69)  Ms. Handley said the officers told her she could forget about Javon because he was gone.  (Tr. at 69)  After that, Ms. Handley said, "I didn't even care."  (Tr. at 69)

10.      Officer Keil went out to his car to retrieve a Consent to Search form.  (Tr. at 11-12)  Officer Tomanio read the form to Kaneshia Handley.  (Tr. at 12, 14, 37-38)  Ms. Handley disputes that the form was read to her, but she knew it was a consent form for the officers to search the house.  (Tr. at 74)  Ms. Handley signed the form.  (Tr. at 12, 14, 38-39, 54-55)  The form read:

> I,    _Kaneshia Handley_____ freely and voluntarily
>            (Name of Person Consenting to Search)
>
> give my consent to members of the Kansas City, Missouri Police Department to conduct a search of:    _my residence at 2632 Euclid_____ and seize
>                          (Description of Premises, Property or Person)
>
> any person, property, item, or substance determined by the Kansas City, Missouri Police Department to be relevant either to the matter under investigation or any criminal matter.  I further authorize the taking of photographs and the making of video recordings and sketches of the property, items, substance or areas being searched.
>
> I understand that the Police Department has not obtained a search warrant authorizing this search and that I have a constitutional right to refuse permission to conduct the requested search.  I also understand that any evidence found as a result of the search may be used against me in court.
>
> (Date/Time) _12-19-10  0720_  (Signed)  _Kaneshia Handley_____

(Government's Ex. 1)

11.      Officer Keil testified that Kaneshia Handley was never placed in handcuffs while in the house.  (Tr. at 10)  No officers had their guns drawn on her inside the house.  (Tr. at 10)  Ms. Handley was not threatened with arrest if she did not sign the consent form.  (Tr. at 22-23)  Ms. Handley testified that she was not handcuffed until after she signed the consent form.  (Tr. at 69)  Ms. Handley confirmed that no police officer had pointed a gun at her.  (Tr. at 75)  Ms. Handley testified that she knew by signing the form that she was giving the officers consent to search the residence.  (Tr. at 81)

12.      At some point, the officers ran Kaneshia Handley's name through their computer system and she responded back with a felony warrant.  (Tr. at 9-10, 39)  Given that she had a felony warrant, Ms. Handley was told that she was going to be arrested on the warrant and taken to jail.  (Tr. at 10, 39)  It is standard policy of the Kansas City, Missouri Police Department to arrest someone if it is discovered that the person has an outstanding felony arrest warrant.  (Tr. at 10, 40, 53)  Ms. Handley was allowed

4

to make a phone call to a family member to come and get her children. (Tr. at 43) Officer Keil testified that he did not know if Ms. Handley was advised of the warrant before or after she signed the consent form. (Tr. at 30) Officer Tomanio testified that he believed Ms. Handley was told of the warrant before she signed the consent form. (Tr. at 39-40) Ms. Handley testified that she was not told there was a warrant for her arrest until she was taken downtown for questioning, but she knew personally that she had a warrant. (Tr. at 68, 75)

13.     Detective Stammler took part in the search of 2632 Euclid. (Tr. at 55) Detective Stammler recovered an SKS rifle from a closet at the top of the stairs. (Tr. at 55-56) Other items seized from the residence included two cell phones, Carhartt bibs, a backpack, a laptop, two bandanas, a bayonet, an SKS magazine, a spring and a scope. (Government's Ex. 1)

14.     Kaneshia Handley testified that her name was not on the lease for 2632 Euclid. (Tr. at 64) Javon Turner paid the rent. (Tr. at 64) Ms. Handley was 22 years old at the time of the hearing and 21 at the time of this incident. (Tr. at 65) At the time of the incident, Ms. Handley's children were ages four, three and one. (Tr. at 65) Ms. Handley does not have a high school diploma as she dropped out early, "[p]robably about the 11th grade." (Tr. at 65, 80)

## III. DISCUSSION

Defendant Turner seeks to suppress all evidence recovered from 2632 Euclid on December 19, 2010. Defendant argues:

9.     The Investigative Team had no lawful authority to enter into the residence without a warrant prior to obtaining a valid consent to search, since the only adult present, Kaneshia Handley,[4] was already arrested on the outstanding warrant, and Defendant Turner was already in police custody.

10.     The alleged consent to search was not voluntarily given by Kaneshia Handley.

11.     Kaneshia Handley had no legal authority to authorize a search of the residence.

12.     Kaneshia Handley had no legal authority to authorize a search of the upstairs closet or the back bedroom of the residence utilized by Defendant Turner.

13.     Defendant Turner suggests to the Court that the search of the residence bearing street address 2632 Euclid was illegal, since the search was not incident to the arrest of Kaneshia Handley; Defendant Turner was already in police custody; and that any consent purportedly signed by Kaneshia Handley was obtained by duress since the investigative team had already entered into the residence without lawful reason or authority so to do; and the consent signed by Kaneshia Handley was insufficient to authorize a search of the residence solely under the control of

_____

[4]While the motion to suppress refers to another woman, at the suppression hearing, defense counsel advised the Court that the motion should refer to Kaneshia Handley. (Tr. at 2-3)

Defendant Turner.

(Motion to Suppress Evidence Recovered From 2632 Euclid, Kansas City, Missouri (doc #59) at 2-3)  The Court will address defendant's arguments.

A.    Entry Into the Residence

In connection with an investigation into a string of armed robberies of area grocery stores, four officers approached the residence at 2632 Euclid shortly after 7:00 a.m. to see if they would be allowed to go inside and sweep the house for suspects and to try and get a consent to search to see if there was evidence in the house of previous crimes.  (See Fact Nos. 2 and 5, supra)  The door was opened by a female.  (See Fact No. 5, supra)  Officer Keil testified that the officers explained who they were, that they were there regarding an ongoing robbery investigation and asked if they could come in and speak with her.  (Id.)  Kaneshia Handley testified that basically, the officers just invited themselves in, but that she did not tell the officers to leave her house.  (Id.)

The Eighth Circuit has acknowledged that a "knock and talk"[5] is a reasonable investigative technique.  See United States v. Weston, 443 F.3d 661, 667 (8th Cir.), cert. denied, 549 U.S. 956 (2006).  While defendant argues that the officers had no lawful authority to enter into the residence since Ms. Handley was already under arrest on the outstanding warrant, the facts presented at the hearing do not support the argument that Ms. Handley was immediately placed under arrest or that the officers even knew Ms. Handley's name prior to their entry into the residence.  The Court finds that Ms. Handley had both actual and apparent authority to provide the officers with permission to enter.  Valid consent may be given by a third party who possessed common authority over or other sufficient relationship to the premises.  See United States v. Hilliard, 490 F.3d 635, 639 (8th Cir. 2007).  Not only did Ms. Handley open the door after the officers knocked and allow the officers to come in, appearing to have authority to allow their entry, she also lived in the residence.  There was nothing improper in the manner in which the officers gained access to the residence.

_____

[5]A "knock and talk" is an investigatory technique in which law enforcement officers approach the door of a dwelling seeking voluntary conversation and consent to search.  See United States v. Wise, 588 F.3d 531, 534 n.3 (8th Cir. 2009).

6

B.    Search of the Residence

"It is well established that warrantless searches violate the Fourth Amendment unless they fall within a specific exception to the warrant requirement, United States v. Karo, 468 U.S. 705, 717 (1984), and that consent is 'one of the specifically established exceptions to the requirements of both a warrant and probable cause.'  Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973)."  United States v. Jaras, 86 F.3d 383, 388 (5th Cir 1996).  See also United States v. Elam, 441 F.3d 601, 603 (8th Cir. 2006)("the Fourth Amendment does not prohibit the warrantless search of a person's home or other property if the police have obtained the voluntary consent of a third party with common authority over the premises or property").

1.    Voluntariness of Consent

The government bears the burden of proving that consent was voluntarily given.  See United States v. Willie, 462 F.3d 892, 896 (8th Cir. 2006), cert. denied, 549 U.S. 1292 (2007).  The test in reviewing a consent search is whether, in the totality of the circumstances, the consent was given voluntarily and without coercion.  See Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973).  In United States v. Willie, the court set forth the following guidance in judging the voluntariness of a consent to search:

> Our case law offers a catalogue of factors to consider in judging the voluntariness of a defendant's consent to search.  Some relate to the characteristics and behavior of the defendant, such as the defendant's age, intelligence and education, knowledge of his constitutional rights (whether from *Miranda* warnings in the encounter at issue or from previous interactions with police), whether he was under the influence of drugs or alcohol, and whether he objected to the search or stood by silently as it was occurring. ... Others relate to the environment surrounding the defendant at the time he gave his consent, such as whether he was in custody or under arrest and whether he was in a public or secluded place. ... Still others relate to the interaction between police and the defendant in the encounter, such as whether police officers detained and questioned the defendant for a long time before obtaining his consent, whether they threatened, physically intimidated, or punished him, and whether they made promises or misrepresentations upon which the defendant relied in giving his consent. ... No one factor is dispositive; they are merely tools for analyzing the "totality of all the circumstances." ...

462 F.3d at 896 (citations omitted).

In this case, when Officer Keil asked for consent to search, Ms. Handley was initially

7

reluctant, saying "I don't know, I don't know." (See Fact No. 7, supra) Ms. Handley's initial reluctance to consent negates a coercive atmosphere. Ms. Handley acknowledges that she was told that she did not have to give her consent. (See Fact No. 8, supra) After a few minutes, Ms. Handley told the officers that she would sign the consent form. (See Fact Nos. 7 and 8, supra) Detective Stammler reminded Ms. Handley that she did not have to sign the form. (See Fact No. 8, supra) The officers arrived at the residence shortly after 7:00 a.m. (see Fact No. 5, supra) and Ms. Handley signed the Consent to Search form at approximately 7:20 a.m. (see Fact No. 10, supra), a mere twenty minutes later. No evidence was presented to indicate that Ms. Handley did not understand what the officers were requesting. Rather, Ms. Handley testified that she knew by signing the form that she was giving the officers consent to search the residence. (See Fact No. 11, supra) No evidence was presented to indicate that Ms. Handley was under the influence of alcohol or drugs. No evidence was presented to indicate that Ms. Handley was threatened. (See Fact No. 11, supra) No evidence was presented to indicate that Ms. Handley made any objections while the officers were searching the residence. At the time of the search, Ms. Handley was 21 years old. (See Fact No. 14, supra) While it was not clear from the evidence presented whether Ms. Handley had been advised that there was a warrant for her arrest prior to her signing the consent, Ms. Handley testified that she was not told there was a warrant for her arrest until she was taken downtown for questioning. (See Fact No. 12, supra)

Based on the evidence outlined above, the Court finds that Ms. Handley was not coerced by the officers and was aware of her right to refuse consent. Ms. Handley voluntarily and intentionally waived her rights and consented to a search of her residence. The Government has met its burden in establishing that Ms. Handley's consent to search was freely and voluntarily given and not the result of duress or coercion.

### 2. Authority to Consent

"Consent need not be given by the defendant, but rather may be given by 'a third party who possessed common authority over or other sufficient relationship to the premises ... sought to be

inspected.'" <u>United States v. Amratiel</u>, 622 F.3d 914, 915 (8th Cir. 2010)(quoting <u>United States v.</u> <u>Matlock</u>, 415 U.S. 164, 171 (1974)). The government has the burden of establishing the effectiveness of the third party's consent by demonstrating that the third party had either actual or apparent authority to consent to the search. <u>See United States v. Davis</u>, 332 F.3d 1163, 1169 (9th Cir. 2003). In <u>United States v. Nichols</u>, 574 F.3d 633, 636 (8th Cir. 2009), the court found that the defendant's cohabitant girlfriend had common authority to consent to a search of the residence even though she had no property interest in the residence. "[E]ven where third-party consent comes from an individual without actual authority over the property searched, there is no Fourth Amendment violation if the police conducted the search in good faith reliance on the third-party's *apparent authority* to authorize the search through her consent." <u>United States v. Purcell</u>, 526 F.3d 953, 963 (6th Cir. 2008).

The Court finds that Kaneshia Handley had apparent, as well as actual, authority over the entire residence. The officers had been told by Ms. Handley that she lived there in the residence with her boyfriend, Javon Turner. (<u>See</u> Fact No. 6, <u>supra</u>) Ms. Handley told Detective Stammler that she had lived there since October. (<u>Id.</u>) There were photographs of Ms. Handley with defendant Turner around the house. (<u>Id.</u>) Ms. Handley had her own key to the house. (<u>Id.</u>) Ms. Handley's children were sleeping in the house. (<u>See</u> Fact No. 5, <u>supra</u>) Ms. Handley signed a Consent to Search "my residence at 2632 Euclid." (<u>See</u> Fact No. 10, <u>supra</u>) "The typical reasonable person would have understood this to mean every room, the sum of which is the house [i.e. the residence]." <u>United States v. Fleck</u>, 413 F.3d 883, 892 (8th Cir. 2005). <u>See also United States v. Almeida-Perez</u>, 549 F.3d 1162, 1172 (8th Cir. 2008)("Where a third party appears to have authority over the entire premises, the police may rely on that person's consent to search throughout the house, so long as the consent appeared to extend so far.") The Government has met its burden in establishing the effectiveness of Ms. Handley's consent.

       3.    <u>Lack of Defendant Turner's Consent</u>

The law is clear that "[w]hen officers obtain valid third-party consent, they are not also

required to seek consent from a defendant, even if detained nearby." <u>United States v. Amratiel</u>, 622 F.3d 914, 917 (8th Cir. 2010)(citing <u>United States v. Matlock</u>, 415 U.S. 164, 171 (1974)). A "potential objector, nearby but not invited to take part in the threshold colloquy, loses out ... [s]o long as there is no evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection." <u>Georgia v. Randolph</u>, 547 U.S. 103, 121 (2006). In <u>United States v. Hudspeth</u>, 518 F.3d 954, 960-61 (8th Cir. 2008), the court upheld a search and seizure of a home computer despite the defendant's previous objection where the defendant's wife consented to the search and seizure and the defendant was not physically present to object at the time his wife consented.

Here, defendant Turner was not present at the residence when the officers were there as he had been arrested following a chase that ensued as a result of surveillance on a grocery store which surveillance was part of an investigation into a string of armed robberies of area grocery stores. (<u>See</u> Fact No. 1, <u>supra</u>) The officers did not remove defendant Turner from his residence so that he would not be present to object to a search of the residence. As set forth in <u>Amratiel</u>, since the officers had the consent of Kaneshia Handley, they were not required to also seek consent from defendant Turner, even though they had him in custody, prior to conducting the search. As set forth in <u>Hudspeth</u>, even if defendant Turner had been asked for his consent to search the residence (which does not appear to be the case) and refused, the officers could still seek Ms. Handley's consent and search the residence pursuant to her consent given that defendant Turner was not physically present to object.

In his supplemental briefing, defendant Turner states that "[u]nfortunately the facts in <u>Hudspeth</u> are remarkably similar to the facts in the instant case before this Court." (Suggestion in Support of Motion to Suppress (doc #65) at 4) Defendant Turner then argues that the <u>Hudspeth</u> case was wrongly decided. Notwithstanding the <u>Hudspeth</u> decision, defendant Turner argues that the evidence should be suppressed because the police failed to ask his permission because they knew he would most likely refuse permission for the search and they did not want to contaminate the consent search by defendant's prior objection. (<u>Id.</u> at 6)

The Court declines defendant Turner's invitation to depart from clear Eighth Circuit precedent. The officers were not required to seek consent from defendant Turner when they had a consent to search from Ms. Handley.

## IV. CONCLUSION

For the reasons set forth above, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying defendant Turner's Motion to Suppress Evidence Recovered From 2632 Euclid, Kansas City, Missouri (doc #59).

Counsel are reminded they have fourteen days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections to same. A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.


*/s/ Sarah W. Hays*
SARAH W. HAYS
UNITED STATES MAGISTRATE JUDGE

11